# EXHIBIT A

IN THE SUPERIOR COURT OF CHATHAM COUNTY

STATE OF GEORGIA

e-Filed in Office
Tammie Mosley
Clerk of Superior Court
Chatham County
Date: 2/5/2025 4:00 PM
Reviewer: KW

THE MAYOR AND ALDERMEN OF THE

CITY OF SAVANNAH, GEORGIA

CIVIL ACTION
NUMBER _____    SPCV25-00167-MI

PLAINTIFF

VS.

3M COMPANY, et al.

DEFENDANT

## SUMMONS

SAGE AUTOMOTIVE INTERIORS, INC.

TO THE ABOVE NAMED DEFENDANT:    c/o Corporation Service Company, 2 Sun Court, Ste. 400, Peachtree Corners, Gwinnett County, GA, 30092

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney whose name and address is:

Jeffrey R. Harris
Harris Lowry Manton LLP
410 E. Broughton St., Savannah, GA 31401

an answer to the complaint which is herewith served upon you, within 30 days after service of summons upon you, exclusive of the day of service. If you fail to do so, judgement by default will be taken against you for the relief de-manded in the complaint.

This_____5_____ day of _____February_____, _____2025_____.

TAMMIE MOSLEY
Clerk of Superior Court
CHATHAM COUNTY

By_____
Deputy Clerk

IN THE SUPERIOR COURT OF CHATHAM COUNTY
STATE OF GEORGIA

e-Filed in Office
Tammie Mosley
Clerk of Superior Court
Chatham County
Date: 2/5/2025 4:00 PM
Reviewer: KW

THE MAYOR AND ALDERMEN OF THE
CITY OF SAVANNAH, GEORGIA,

 Plaintiff,

v.

3M COMPANY; ALADDIN
MANUFACTURING CORPORATION;
ALLNEX USA, INC.; ARCHROMA U.S., INC;
AUGUSTA LIQUIDATIONS LLC;
CLARIANT CORPORATION; CLEARWATER
PAPER CORPORATION; CORTEVA, INC.;
COVESTRO LLC; COVESTRO COATING
RESINS, INC.; CYTEC INDUSTRIES INC.;
DAIKIN AMERICA, INC.; DUPONT DE
NEMOURS, INC.; E.I. DU PONT DE
NEMOURS AND COMPANY; EIDP, INC.;
ENVALIOR ENGINEERING MATERIALS,
INC.; FIRST QUALITY TISSUE SE, LLC.;
GRANITEVILLE SPECIALTY FABRICS,
LLC; GRAPHIC PACKAGING HOLDING
COMPANY; GRAPHIC PACKAGING
INTERNATIONAL, LLC; HALOCARBON
LIFE SCIENCES, LLC; HALOCARBON, LLC;
HPC HOLDINGS, INC.; ICT INDUSTRIES,
INC.; INDUSTRIAL METAL FINISHING,
INC.; INNOVATIVE CHEMICAL
TECHNOLOGIES, INC.; INTERNATIONAL
PAPER COMPANY; INV PERFORMANCE
SURFACES, LLC; JPS COMPOSITE
MATERIALS CORP.; KEMIRA WATER
SOLUTIONS INC.; KIMBERLY-CLARK
CORPORATION; MILLIKEN & COMPANY;
MOHAWK CARPET, LLC; MOHAWK
INDUSTRIES, INC.; MOUNT VERNON
MILLS, INC.; OWENS CORNING; OWENS
CORNING COMPOSITE MATERIALS, LLC;
OWENS CORNING ROOFING AND
ASPHALT, LLC; OWENS CORNING SALES,
LLC; PACTIV LLC; PRAYON INC.;
QUALAWASH HOLDINGS, LLC; SAGE
AUTOMOTIVE INTERIORS, INC.; SHAW

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No.: SPCV25-00167-MI

TRIAL BY JURY REQUESTED

INDUSTRIES GROUP, INC.; SHAW )
INDUSTRIES, INC.; SOLVAY SPECIALTY )
POLYMERS USA, LLC; STERLING )
SPECIALTY CHEMICALS US LLC; THE )
CHEMOURS COMPANY; THE CHEMOURS )
COMPANY FC, LLC; TRANTECH )
RADIATOR PRODUCTS, INC.; and )
FICTITIOUS DEFENDANTS A–J, those )
persons, corporations, partnerships or entities )
who acted either as principal or agent, for or in )
concert with the other named Defendants and/or )
whose acts caused or contributed to the damages )
sustained by the Plaintiff, whose identities are )
unknown to the Plaintiff, but which will be )
substituted by amendment when ascertained, )
                                                                    )
        Defendants.                                          )
                                                                    )

## VERIFIED COMPLAINT

Plaintiff The Mayor and Aldermen of the City of Savannah, Georgia (hereinafter referred to as "Savannah" or "Plaintiff") brings this action against the above-captioned Defendants and sets forth in detail the parties, facts, legal claims, and damages with particularity, as follows:

## STATEMENT OF THE CASE

1.      This case arises out of the manufacture, sale, use, and discharge of per- and poly-fluoroalkyl substances ("PFAS")[1] in commercial applications. This case does not arise out of the use or discharge of Aqueous Film-Forming Foam ("AFFF") or any products used by, supplied to, or manufactured to the specifications of the federal government.

---

[1] As used herein, "PFAS" refers to all perfluorinated compounds, perfluorochemicals, polyfluorochemicals, perfluoroalkyl substances, polyfluoroalkyl substances, related chemicals that degrade to PFAS, and any precursors to PFAS, including but not limited to, perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonate ("PFOS"), GenX, HFPO-DA, NEtFOSAA, NMeFOSAA, PFBS, PFDA, PFDoA, PFHpA, PFHxS, PFNA, PFTrDA, PFTA, PFUnA, 11Cl0PF3OUdS, 9Cl-PF3ONS, ADONA, PFPeS, PFHpS, 4:2 FTS (1H, 1H, 2H, 2H,-perfluorohexane sulfonic acid), 6:2 FTS (1H, 1H, 2H, 2H,-perfluorohexane sulfonic acid), 8:2 FTS (1H, 1H, 2H, 2H,-perfluorohexane sulfonic acid), PFBA, PFPeA, PFMBA, PFMPA, PFEESA, PTFE, and NFDHA.

2.     For decades, some of the world's largest chemical companies have manufactured PFAS, a family of synthetic chemicals valued for their ability to repel oil and water and resist staining. Because of these commercially valuable properties, a number of industries, including carpet, textiles, paper, metal plating and finishing, electronics, and more, have purchased and used PFAS in their manufacturing processes.

3.     The same chemical properties that make PFAS so valuable to these industries are also what makes PFAS dangerous. PFAS are known by the Environmental Protection Agency ("EPA") and industrial users to be persistent in the environment, bio-accumulative in humans and animals, and toxic (referred to in the chemical industry as "PBT").

4.     It is because of their environment persistence and bio-accumulative nature that PFAS are commonly referred to as "forever chemicals."

5.     Conventional drinking water systems are incapable of removing these "forever chemicals" from water. As a result, PFAS pass through conventional drinking water systems into the environment and eventually the bloodstreams of the general public, where they bioaccumulate over time.

6.     The EPA has found that PFAS are likely to cause an array of adverse health and environmental effects, including but not limited to, low birth weight in children, miscarriage, and cancer.

7.     The current scientific consensus is that there is no safe level of PFAS in drinking water.

8.     The Defendants in this case, which belong to a variety of different industries, have all caused or contributed to these toxic chemicals invading the Plaintiff's source water supply that is used to produce drinking water.

9.    The PFAS Manufacturer Defendants created and sold these chemicals to industries throughout Georgia and South Carolina with full knowledge of their products' pernicious effects and likelihood of causing pollution to Plaintiff's source water supply. Rather than making efforts to warn or prevent this pollution, these Defendants actively concealed and withheld information from regulatory agencies, customers, and the general public, all the while causing these chemicals to continuously damage Plaintiff.

10.    The PFAS User Defendants purchased and used PFAS and products containing or degrading into PFAS in their industrial processes. These Defendants have continuously caused and permitted PFAS-contaminated waste streams to discharge into the Savannah River and/or waterways that flow to the Savannah River upstream from where Plaintiff withdraws its source water.

11.    These Defendants have generated PFAS-laden wastewater and knew or should have known, for years – sometimes decades – that this wastewater would pollute Plaintiff's source water supply and cause Plaintiff injury.

12.    Nevertheless, the Defendants have jointly and continuously caused these "forever chemicals" to enter the Plaintiff's source water.

13.    Now, because of the PFAS pollution that Defendants have caused, Plaintiff must remove these harmful chemicals from its drinking water in order to meet its obligations as a public water provider, comply with federal regulations and guidelines, and most importantly, protect human health and the environment.

14.    The Defendants have known or should have known that the Plaintiff, like most public water systems, does not currently have the treatment technology necessary to remove PFAS

from its source water. Therefore, Plaintiff will be required to add costly and sophisticated new treatment technologies in order to remove Defendants' PFAS from its drinking water.

## JURISDICTION AND VENUE

15.     The wrongful acts perpetrated by the Defendants which form the basis of this Complaint, including the ongoing and continuing trespass, the creation of an ongoing and continuing nuisance, negligence, and failure to warn occurred and is occurring in Chatham County, Georgia and has injured and will continue to injure the Plaintiff in Chatham County, Georgia within the applicable statutes of limitations. The Defendants, jointly and severally, have caused ongoing and continuing damages to Plaintiff.

16.     Jurisdiction is proper in this Court pursuant to Article 6, § 4, ¶ 1 of the Georgia Constitution.

17.     Venue is proper in this Court because Plaintiff's causes of action originated in Chatham County and because at least one of the Defendants has an office and transacts business in Chatham County.

## DISCLAIMER

18.     This lawsuit is brought under the laws of the State of Georgia. Plaintiff asserts no federal cause of action, invokes no federal statutes and seeks no relief that is based on any federal statute or laws. Any federal claims are expressly disclaimed by Plaintiff.

19.     Complete diversity does not exist between Plaintiff and all Defendants.

20.     This case arises out of the manufacture, supply, use, and disposal of PFAS in numerous industries, including the carpet, textile, paper and metal finishing/fabricating industries, and Plaintiff makes no claim that the manufacture or use of Aqueous Film-Forming Foam ("AFFF") in any way caused or contributed to its damages or the claims asserted in this lawsuit.

21.    Upon information, belief, and preliminary investigation, the PFAS currently contaminating Plaintiff's source and drinking water is from industrial sources and is not the result of any AFFF manufactured pursuant to military specifications.

22.    Plaintiff expressly disclaims any cause of action or damages arising from or associated with AFFF manufacture, sale, use or disposal by the named Defendants, or by any unnamed defendant or entities, including any legal or factual claim based on alleged "Mil Spec AFFF." Plaintiff expressly disclaims any potential claims arguably arising from any federal enclaves, including any military installations or other locations that may have used AFFF pursuant to military specifications. This case is brought against the Defendants solely in their capacities as private manufacturers and users of PFAS.

## NO CLASS ACTION PARTICIPATION

23.    Several Defendants in this case have been sued in other cases involving allegations of PFAS pollution to public water systems. In 2023, 3M and DuPont settled nationwide, multi-district, class-action claims related to the contamination of public water supplies with PFAS for approximately $10 billion and $1 billion, respectively. See *In re: Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873-RMG (D.S.C.) ("*AFFF Litigation*").

24.    Prospective class members in the *AFFF Litigation* had the option of "opting out" of the 3M and DuPont settlements in order to pursue individual lawsuits against 3M and DuPont. Plaintiff validly and timely exercised its right to "opt out" of the *AFFF Litigation* Class Action Settlements with 3M and DuPont to pursue its claims in this lawsuit. Plaintiff has received confirmation from the Notice Administrator overseeing these settlements that its opt-out was in fact "compliant."

25.    On February 26, 2024, and March 29, 2024, Judge Richard Gergel, the United States District Court Judge for the District of South Carolina overseeing the *AFFF Litigation*, entered orders of final approval on the DuPont and 3M settlements, respectively. At no time has 3M, DuPont, or any other party raised objections to Plaintiff's decision to opt-out from the settlements.

PARTIES

I.    Plaintiff

26.    Plaintiff, located in Chatham County, is a municipal corporation organized under the laws of the State of Georgia, which operates various departments to enhance the health, safety, and general well-being of its citizens.

27.    Plaintiff operates its own water department that, among other responsibilities, provides drinking water to the citizens of Savannah, Chatham County, and Effingham County, Georgia. Plaintiff owns and operates a surface water treatment plant, the Savannah Industrial and Domestic Water Plant (hereinafter referred to as the "I&D Plant"), located at 6183 GA-21, Savannah, GA 31407. Plaintiff also owns and operates a surface water intake on the banks of Abercorn Creek, located at 456 Abercorn Road, Rincon, GA 31326, that draws source water from the creek and pumps it to the I&D Plant for treatment. Plaintiff owns these properties and enjoys riparian rights to the source water from Abercorn Creek, as well as property rights over the source water which it draws, treats and sells to its customers as drinking water.

28.    Plaintiff's conventional water treatment facilities are currently incapable of removing or treating Defendants' PFAS to levels deemed compliant and/or safe pursuant to applicable regulations.

29.     Plaintiff has been and continues to be damaged due to the negligent, willful, and wanton conduct of the Defendants, as well as a result of the continuous nuisance and trespass caused by Defendants' past and present manufacture, use, purchase, sale, supply, discharge, and/or release of PFAS.

30.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, and will continue to suffer, substantial economic and consequential damage, including but not limited to: past and future expenses associated with the testing and monitoring of PFAS contamination levels in Plaintiff's source water and drinking water; past and future expenses associated with testing, monitoring, and installing emergency filtration and pumping systems; pilot program costs associated with permanent filtration systems capable of removing Defendants' PFAS from Plaintiff's drinking water; past and future costs associated with the purchase, installation, and operation of permanent filtration systems and/or technologies capable of removing Defendants' PFAS from Plaintiff's drinking water; costs associated with remediating Plaintiff's existing treatment and pumping facilities; damage to goodwill and reputation; and lost revenue and sales. In addition, Plaintiff will incur past, present, and future engineering, operating, and maintenance costs.

31.     Plaintiff seeks compensatory and punitive damages to the fullest extent allowed by Georgia law. Plaintiff seeks compensatory damages for filtration equipment, piping, and adequate permanent facilities necessary to operate filtering systems sufficient to remove all PFAS from drinking water. Plaintiff also seeks abatement of the continuous nuisance and trespass caused by Defendants, as well as equitable and injunctive relief compelling the Defendants to remediate their contamination and prevent additional releases of PFAS and other toxic chemicals into Plaintiff's water supply.

32.     This Complaint is being brought by Plaintiff based, in part, on information provided and affirmed by Ronald A. Feldner, Chief of Water Resources, in his official capacity, pursuant to O.C.G.A. § 41-2-2. A verification by Mr. Feldner is attached to this Complaint pursuant to O.C.G.A. § 9-11-110.

II.    Defendants

A. PFAS Manufacturers

33.     Defendant 3M Company ("3M") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in St. Paul, Minnesota. 3M is registered to do business in the State of Georgia. 3M has knowingly manufactured, sold, used and/or transported PFAS or products that contain and/or degrade into PFAS in the States of Georgia and/or South Carolina, which ultimately end up in the Savannah River basin and Plaintiff's source water supply. PFAS manufactured, sold, used, and/or transported by 3M is currently contaminating Plaintiff's source water. As a result, 3M is causing and contributing to a continuous nuisance, trespass, and injury to Plaintiff in Chatham County.

34.     Defendant Archroma U.S., Inc., ("Archroma") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Charlotte, North Carolina. Archroma is registered to do business in the State of Georgia. Archroma owns and/or operates a chemical plant located at 788 Chert Quarry Rd, Martin, SC 29836. Upon information and belief, Archroma has discharged PFAS from its operations into the Three Rivers Regional Municipal Solid Waste Landfill, which sends its leachate to the Horse Creek Wastewater Treatment Plant ("HCWWTP"), which is discharged into the Savannah River basin. Archroma's PFAS contamination passes through the landfill and HCWWTP and ultimately ends up in Plaintiff's source water supply in Chatham County. Upon information and belief, Archroma has

- 9 -

also designed, manufactured, marketed, promoted, distributed, used and/or sold PFAS and/or products that contain or degrade into PFAS in the States of Georgia and/or South Carolina, which ultimately end up in the Savannah River basin and Plaintiff's source water supply. Upon information and belief, Archroma is a successor to Clariant. PFAS manufactured, sold, used, and/or transported by Archroma is currently contaminating Plaintiff's source water. As a result, Archroma is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

35.     Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of the State of New York, with its principal place of business located in Charlotte, North Carolina. Clariant is registered to do business in the State of Georgia. Clariant formerly owned and operated a chemical plant located at 788 Chert Quarry Rd, Martin, SC 29836. Upon information and belief, Clariant has manufactured and/or generated PFAS, PFAS-laden materials and/or PFAS-laden waste from its operations and disposed of the PFAS, PFAS-laden materials and/or PFAS-laden waste into the Three Rivers Regional Municipal Solid Waste Landfill, which sends its leachate to the HCWWTP, which discharges into the Savannah River basin. Clariant's PFAS passed through the landfill and HCWWTP and ultimately ended up in Plaintiff's source water supply in Chatham County. Upon information and belief, Clariant has also designed, manufactured, marketed, promoted, distributed, used and/or sold PFAS and/or products that contain or degrade into PFAS in the States of Georgia and/or South Carolina, which ultimately end up in the Savannah River basin and Plaintiff's water supply. Upon information and belief, Clariant is a predecessor of Archroma. PFAS manufactured, sold, used, and/or transported by Clariant is currently contaminating Plaintiff's source water. As a result, Clariant is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

- 10 -

36.     Defendant Daikin America, Inc. ("Daikin") is a foreign corporation organized under the laws of the State of Delaware and does business in the State of Georgia. Upon information and belief, Daikin is a wholly owned subsidiary of Daikin Industries, Ltd. Daikin has and continues to manufacture, sell, use and/or transport PFAS and PFAS-related products or products which degrade into PFAS in the States of Georgia and/or South Carolina, which ultimately end up in the Savannah River basin and Plaintiff's source water supply. PFAS manufactured, sold, used, and/or transported by Daikin is currently contaminating Plaintiff's source water. As a result, Daikin is causing and contributing to a continuous nuisance, trespass, and injury to Plaintiff in Chatham County.

37.     Defendant E.I. du Pont de Nemours and Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware.

38.     Defendant DuPont de Nemours, Inc. is a corporation organized and existing under the laws of the State of Delaware. DuPont de Nemours, Inc. does business in the State of Georgia.

39.     Defendant Corteva, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware. Corteva, Inc. is registered to do business in the State of Georgia.

40.     Defendant EIDP, Inc., formerly known as "E.I. du Pont de Nemours and Company," is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware. EIDP, Inc. is registered to do business in the State of Georgia.

41.     Defendants E.I. du Pont de Nemours and Company, Dupont de Nemours, Inc., Corteva, Inc. and EIDP, Inc. are hereinafter collectively referred to as "DuPont." DuPont has

manufactured, sold, used, and/or transported PFAS and PFAS-related products or products which degrade into PFAS in the States of Georgia and/or South Carolina, which ultimately end up in the Savannah River basin and Plaintiff's source water supply. PFAS manufactured, sold, used, and/or transported by DuPont is currently contaminating Plaintiff's source water. As a result, DuPont is causing and contributing to a continuous nuisance, trespass, and injury to Plaintiff in Chatham County.

42.     Defendant HPC Holdings, Inc. is a domestic limited liability company organized under the laws of the State of Georgia, with its principal place of business located at 6525 The Corners Parkway, Suite 200, Peachtree Corners, Georgia, 30092.

43.     Defendant Halocarbon Life Sciences, LLC, formerly known as Halocarbon Products Corporation, is a limited liability company organized and existing under the laws of the State of New Jersey, with its principal place of business located at 6525 The Corners Parkway, Suite 200, Peachtree Corners, Georgia, 30092. Halocarbon Life Sciences, LLC is registered to do business in the State of Georgia.

44.     Defendant Halocarbon, LLC is a domestic limited liability company organized under the laws of the State of Georgia, with its principal place of business located at 6525 The Corners Parkway, Suite 200, Peachtree Corners, Georgia, 30092.

45.     Defendants HPC Holdings, Inc., Halocarbon Life Sciences, LLC, and Halocarbon, LLC are hereinafter collectively referred to as "Halocarbon." Halocarbon owns and operates a chemical manufacturing facility located at 1100 Dittman Ct, Beech Island, SC 29842. Halocarbon promotes on its website that "for over 65 years, Halocarbon has been one of the world's leading producers of high-quality fluorochemicals." Upon information and belief, Halocarbon has manufactured and/or generated PFAS, PFAS-laden materials and/or PFAS-laden waste from its

operations and disposed of the PFAS, PFAS-laden materials and/or PFAS-laden waste from its operations into the HCWWTP, which is discharged into the Savannah River basin. Halocarbon's PFAS passes through the HCWWTP and ultimately ends up in Plaintiff's source water supply in Chatham County. Upon information and belief, Halocarbon has also designed, manufactured, marketed, promoted, distributed, used and/or sold PFAS and/or products that contain or degrade into PFAS in the States of Georgia and/or South Carolina, which ultimately end up in the Savannah River basin and Plaintiff's source water supply. PFAS manufactured, sold, used, and/or transported by Halocarbon is currently contaminating Plaintiff's source water. As a result, Halocarbon is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

46.     Defendant The Chemours Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware. The Chemours Company is registered to do business in the State of Georgia.

47.     Defendant The Chemours Company FC, LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware. The Chemours Company FC, LLC is registered to do business in the State of Georgia.

48.     The Chemours Company and The Chemours Company FC, LLC are hereinafter collectively referred to as "Chemours." Chemours has manufactured, sold, used, and/or transported PFAS and PFAS-related products or products which degrade into PFAS into the States of Georgia. PFAS manufactured, sold, used, and/or transported by Chemours is currently contaminating Plaintiff's source water. As a result, Chemours is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

- 13 -

49.     Defendant Solvay Specialty Polymers USA, LLC ("Solvay") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Alpharetta, Georgia. Solvay owns and operates a specialty polymer manufacturing plant located at 3702 Clanton Rd, Augusta, GA 30906. Solvay's website admits that it uses PFAS. Upon information and belief, Solvay has manufactured and/or generated PFAS, PFAS-laden materials and/or PFAS-laden waste from its operations and disposed of the PFAS, PFAS-laden materials and/or PFAS-laden waste into the City of Augusta Wastewater Treatment Plant ("Augusta WWTP"), which is discharged into the Savannah River basin. Solvay's PFAS passes through the Augusta WWTP and ultimately ends up in Plaintiff's source water supply in Chatham County. Upon information and belief, Solvay has also designed, manufactured, marketed, promoted, distributed, used and/or sold PFAS and/or products that contain or degrade into PFAS in the States of Georgia and/or South Carolina, which ultimately end up in the Savannah River basin and Plaintiff's source water supply. PFAS manufactured, sold, used, and/or transported by Solvay is currently contaminating Plaintiff's source water. As a result, Solvay is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

50.     Defendant INV Performance Surfaces, LLC ("INV"), formerly Invista S.A.R.L., LLC, is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in Wichita, Kansas. INV is registered to do business in the State of Georgia. In 2004, Dupont sold its textiles, interiors and carpet business to Koch Industries, which ultimately became INV, a Koch Industries subsidiary. Upon information and belief, INV purchased PFAS from PFAS Manufacturers, including DuPont, Daikin and Chemours. INV then formulated, blended and or used PFAS in its textile and carpet products and knowingly sold and/or transported PFAS or products that contain and/or degrade into PFAS in the States of

- 14 -

Georgia and/or South Carolina, which ultimately end up in the Savannah River basin and Plaintiff's source water supply. PFAS sold, used, and/or transported by INV is currently contaminating Plaintiff's source water. As a result, INV is causing and contributing to a continuous nuisance, trespass, and injury to Plaintiff in Chatham County.

51. The "PFAS Manufacturers" include the entities listed in Paragraphs 33 through 50.

52. The PFAS Manufacturers have operated in the past, and/or are currently operating, manufacturing facilities related to PFAS and products that contain or degrade into PFAS. The PFAS Manufacturers use PFAS as part of their manufacturing processes or otherwise supply PFAS or products that contain or degrade into PFAS to various industries.

53. PFAS, and products that contain or degrade into PFAS, are manufactured and sold by the PFAS Manufacturers to the PFAS Users. These products are subsequently discharged both directly and/or indirectly into the Savannah River basin, Abercorn Creek and/or other tributaries and watersheds in Georgia or South Carolina, which ultimately end up in the Savannah River basin, Abercorn Creek and Plaintiff's source water supply.

54. Some PFAS Manufacturers, including Archroma, Clariant and Halocarbon, have manufacturing facilities whose PFAS-laden wastewater streams are directly and/or indirectly (through a landfill and/or wastewater treatment plant) discharged into the Savannah River basin, which ultimately end up in Plaintiff's source water supply.

55. The PFAS Manufacturers have known for years that PFAS are harmful to human health, resistant to degradation, and incapable of removal by conventional treatment systems. The PFAS Manufacturers had full knowledge that the PFAS they manufactured and supplied to industrial users would invade the environment and surrounding areas from where Plaintiff

- 15 -

withdraws its source water downstream of discharges that ultimately contaminate the Plaintiff's source water supply.

56.     The PFAS Manufacturers have caused and contributed, and are still causing and contributing to, a continuous nuisance and trespass through their past and present manufacture, use, purchase, sale, supply, discharge, and/or release of PFAS and products that contain or degrade into PFAS.

B.  PFAS Users

57.     Defendant Allnex USA, Inc. ("Allnex") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Alpharetta, Georgia. Allnex is registered to do business in the State of Georgia. Allnex owns and operates coating resins manufacturing plants located at 131 Revco Rd, Beech Island, SC 29842 (the "North Augusta Plant") and 403 Carline Rd. Langley, SC 29851 (the "Langley Plant"). Upon information and belief, the coating resins division of Cytec Industries was spun off and rebranded as Allnex. Allnex is purchasing and/or has purchased PFAS from PFAS Manufacturers. As a result, Allnex is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

58.     Defendant Augusta Liquidations LLC ("Augusta Liquidations") is a limited liability company organized and existing under the laws of Missouri, with its principal place of business located in St. Louis, MO. Augusta Liquidations is registered to do business in the State of Georgia.

59.     Defendant Envalior Engineering Materials, Inc. ("Envalior") f/k/a DSM Engineering Materials, Inc. f/k/a DSM Engineering Plastics, Inc. ("DSMEP") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business

- 16 -

located in Troy, Michigan. Envalior owned and/or operated a polymerization plant located in Augusta, Georgia.

60.     Defendant Covestro LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in Pittsburgh, PA. Covestro LLC is registered to do business in the State of Georgia.

61.     Defendant Covestro Coating Resins, Inc. is a corporation organized and existing under the laws of the State of Delaware. Covestro Coating Resins, Inc. does business in the State of Georgia.

62.     Defendants Covestro LLC and Covestro Coating Resins, Inc. are hereinafter collectively referred to as "Covestro." Covestro currently and/or previously owned and/or operated a powder coating resin manufacturing plant located in Augusta, Georgia.

63.     Upon information and belief, a 600-acre facility and/or set or facilities is located at Columbia Nitrogen Road in Augusta, GA ("Columbia Nitrogen Facilities"). Over the years, Augusta Liquidations, DSMCR, Envalior, and Covestro have owned and/or operated the entire Columbia Nitrogen Facilities, a portion of the Columbia Nitrogen Facilities, or one of more facilities located at/on the Columbia Nitrogen Facilities. These Defendants are hereinafter referred to collectively as the "CNR Defendants."

64.     Upon information and belief, the CNR Defendants owned and/or operated manufacturing facilities that used, purchased and/or discharged PFAS and/or PFAS-containing products from its manufacturing and/or former manufacturing operations.

65.     The ownership and operation of the Columbia Nitrogen Facilities has a long and complicated history with numerous sales, spin-offs, joint ventures, divestitures, name changes and changes in ownership. At one point, DSM Chemicals North America, Inc. (an affiliate of

DSMEP/Envalior) and Shaw Industries, Inc. acquired Nylon Polymer Company L.L.C. ("NPC") via joint venture, which operated facilities at the Columbia Nitrogen Facilities. In 2010, DSM Chemicals North America, Inc. (or one of its affiliates) purchased Shaw's controlling interest in NPC. In 2011, NPC merged into DSMEP. In 2015, DSM Chemicals North America, Inc. changed its name to DSM Chemicals North America, LLC and then to Fibrant, LLC. However, Fibrant filed for bankruptcy. In 2019, Augusta Liquidations purchased Fibrant's facilities/operations at the Columbia Nitrogen Facilities and assumed the environmental liabilities at the facility/property. According to Covestro's website, Covestro completed the acquisition of the Resins & Functional Materials business from Royal DSM (a successor and/or affiliate of DSMEP) in 2021, which, upon information and belief, included DSMEP's operations at the Columbia Nitrogen Facilities. According to its website, Covestro is a "user of PFAS." Currently, the Columbia Nitrogen Facilities are owned and/or operated by Augusta Liquidations, in whole or in part.

66.     As a result of their ownership and operations at the Columbia Nitrogen Facilities, the CNR Defendants are causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

67.     Defendant Clearwater Paper Corporation ("Clearwater Paper") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Spokane, Washington. Clearwater Paper is registered to do business in the State of Georgia. Clearwater Paper purchased the bleached kraft pulp and paperboard mill located at 4278 Mike Padgett Hwy, Augusta, GA 30906 and a corporate office located at 4231 Mike Padgett Hwy, Augusta, GA 30906 from Graphic Packaging in 2024. Clearwater Paper purchased PFAS and/or PFAS-containing products from PFAS Manufacturers for use in its paper business. As a result,

Clearwater Paper is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

68.     Defendant Cytec Industries Inc. ("Cytec") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Princeton, NJ. Cytec is registered to do business in the State of Georgia. Cytec owned and/or operated a manufacturing plant located at 131 Revco Rd, Beech Island, SC 29842 and 403 Carline Rd. Langley, SC 29851. The coating resins division of Cytec Industries was spun off and rebranded as Allnex. Cytec is a subsidiary of Solvay Specialty Polymers USA, LLC. Cytec is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

69.     Defendant First Quality Tissue SE, LLC ("First Quality") is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business located in Great Neck, New York. First Quality is registered to do business in the State of Georgia. First Quality owns and operates a paper and packaging manufacturing facility located at 441 Masters Blvd, Anderson, SC 29626. Upon information and belief, BASF, Honeywell, and Shaw have all formerly owned and/or operated manufacturing businesses at 441 Masters Blvd, Anderson, SC 29626. First Quality is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

70.     Defendant Graniteville Specialty Fabrics, LLC ("GSF") is a domestic limited liability company organized under the laws of the State of Georgia, with its principal place of business located at 3060 Peachtree Rd. NW, Suite 1550, Atlanta, GA, 30305. GSF is registered to do business in the State of Georgia. GSF owns and operates a fabric coating mill located at 511 Leitner Street Graniteville, SC 29829. GSF purchased PFAS and/or PFAS containing products

from PFAS Manufacturers to use in its fabric coating business. As a result, GSF is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

71.     Defendant Graphic Packaging Holding Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1500 Riveredge Parkway, Suite 100, Atlanta, GA, 3032. Graphic Packaging Holding Company is registered to do business in the State of Georgia.

72.     Defendant Graphic Packaging International, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 1500 Riveredge Parkway, Suite 100, Atlanta, GA, 30328. Graphic Packaging International, LLC is registered to do business in the State of Georgia.

73.     Defendants Graphic Packaging Holding Company and Graphic Packaging International, LLC are hereinafter collectively referred to as "Graphic Packaging." Graphic Packaging owned and/or operated a paper mill located at 4278 Mike Padgett Hwy, Augusta, GA 30906. Upon information and belief, Graphic Packaging acquired the paper mill from International Paper in 2018. In 2024, Graphic Packaging sold the paper mill to Clearwater Paper. Graphic Packaging purchased PFAS and/or PFAS-containing products from PFAS Manufacturers to use in its paper business. As a result, Graphic Packaging is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

74.     Defendant Industrial Metal Finishing, Inc. ("Industrial Metal") is a domestic corporation with its principal place of business in Augusta, Georgia. Industrial Metal operates an electroplating facility located at 620 12th St, Augusta, GA 30901. Industrial Metal is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

75.    Defendant Innovative Chemical Technologies, Inc. is a domestic corporation with its principal place of business located at 103 Walnut Grove Road, Cartersville, GA 30120.

76.    Defendant ICT Industries, Inc. is a domestic corporation with its principal place of business located at 103 Walnut Grove Rd, Cartersville, GA 30120. Upon information and belief, ICT Industries, Inc. is the parent company of Innovative Chemical Technologies, Inc.

77.    Defendants Innovative Chemical Technologies, Inc. and ICT Industries, Inc. are hereinafter collectively referred to as "ICT." According to ICT's website, ICT is a chemical company that has an extensive range of surface modification technologies including specialty polymers and surfactants. ICT has purchased, designed, formulated, manufactured, marketed, promoted, distributed, and/or sold PFAS and/or PFAS-containing products used to manufacture PFAS-containing products that were used and/or disposed of in the State of Georgia. As a result, ICT is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

78.    Defendant International Paper Company ("International Paper") is a corporation organized and existing under the laws of the State of New York, with its principal place of business located in Memphis, Tennessee. International Paper is registered to do business in the State of Georgia. International Paper owned and operated a paper mill located at 4278 Mike Padgett Hwy, Augusta, GA 30906 and owned a corporate office located at 4231 Mike Padgett Hwy, Augusta, GA 30906. International Paper sold its Augusta paper mill and corporate office to Graphic Packaging in 2018. International Paper also owns facilities and/or offices at 1201 West Lathrop Avenue Savannah, GA 31402; 1 Bonnybridge Rd, Savannah, GA 31407; and 100 Appleby Road Port Wentworth, GA 31407 in Chatham County, which are not currently believed to be contributing to the contamination of Plaintiff's source water supply. International Paper purchased PFAS and/or PFAS containing products from PFAS Manufacturers to use in its paper business. As

- 21 -

a result, International Paper is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

79.     Defendant JPS Composite Materials Corp. ("JPS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Anderson, South Carolina. JPS owns and operates a composite reinforcement fabrics manufacturing facility located at 2200 S Murray Ave, Anderson, SC 29624. JPS purchased PFAS and/or PFAS containing products from PFAS Manufacturers to use in its fabrics business. As a result, JPS is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

80.     Defendant Kimberly-Clark Corporation ("Kimberly-Clark") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Irving, Texas. Kimberly-Clark is registered to do business in the State of Georgia. Kimberly-Clark owns and operates a paper mill located at 246 Old Jackson Hwy, Beech Island, SC 29842 on the Savannah River. Kimberly-Clark purchased PFAS and/or PFAS containing products from PFAS Manufacturers to use in its paper business. As a result, Kimberly-Clark is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

81.     Defendant Milliken & Company ("Milliken") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Spartanburg, SC. Milliken is registered to do business in the State of Georgia. Milliken operates or previously operated manufacturing plants located at 200 Excelsior Mill Rd, Pendleton, SC 29670 (the "Pendleton Plant"); 1119 S Main St in McCormick, SC 29835 (the "McCormick Plant") and 1395 SC-72, Abbeville, SC 29620 (the "Sharon Plant"). The Sharon Plant is now owned and operated by Sage Automotive Interiors. Milliken purchased PFAS or PFAS-containing products from PFAS

- 22 -

Manufacturers to use in its manufacturing operations. As a result, Milliken is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

82.     Defendant Mohawk Carpet, LLC ("Mohawk Carpet") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in Calhoun, Georgia. Mohawk Carpet is registered to do business in the State of Georgia.

83.     Defendant Mohawk Industries, Inc. ("Mohawk Industries") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Calhoun, Georgia. Mohawk Industries is registered to do business in the State of Georgia.

84.     Defendant Aladdin Manufacturing Corporation ("Aladdin") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Calhoun, Georgia. Aladdin is registered to do business in the State of Georgia.

85.     Defendants Mohawk Carpet, Mohawk Industries, and Aladdin are hereinafter collectively referred to as "Mohawk." Mohawk formerly operated a carpet manufacturing plant at 572 Rocky River Plant Rd, Calhoun Falls, SC 2965 in Abbeville County (the "Rocky River facility") which is located along the Savannah River. Mohawk purchased PFAS and/or PFAS-containing products to use in its carpet manufacturing business. As a result, Mohawk is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

86.     Defendant Mount Vernon Mills, Inc. ("MVM") is corporation organized and existing under the laws of the State of Maryland, with its principal place of business in Mauldin, SC. MVM is registered to do business in the State of Georgia. MVM formerly operated a textile mill located at 1559 S Main St, McCormick, SC 29835 near the Savannah River. MVM formerly operated a textile mill located at 290 Old Anderson Rd Pendleton, South Carolina 29670 until it

sold the property. MVM used PFAS-containing products purchased from the PFAS Manufacturers in its manufacturing process to provide stain resistance and water resistance to its fabrics. As a result, MVM is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

87.    Defendant Owens Corning is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Toledo, Ohio. Owens Corning is authorized to do business in the State of Georgia.

88.    Defendant Owens Corning Composite Materials, LLC is a limited liability company organized and existing under the State of Delaware, with its principal place of business located in Toledo, Ohio. Owens Corning Composite Materials, LLC is authorized to do business in the State of Georgia.

89.    Defendant Owens Corning Roofing and Asphalt, LLC is a limited liability company organized and existing under the State of Delaware, with its principal place of business located in Toledo, Ohio. Owens Corning Roofing and Asphalt, LLC is authorized to do business in the State of Georgia.

90.    Defendant Owens Corning Sales LLC is a limited liability company organized and existing under the State of Delaware, with its principal place of business located in Toledo, Ohio. Owens Corning Composite Materials, LLC is authorized to do business in the State of Georgia.

91.    Defendants Owens Corning; Owens Corning Composite Materials, LLC; Owens Corning Roofing and Asphalt, LLC; and Defendant Owens Corning Sales LLC are hereinafter collectively referred to as "Owens Corning." Owens Corning owns and operates insulation, roofing, and fiberglass composite manufacturing facilities located at 2648 Wagener Rd, Aiken, SC 29801 and 4837 SC-81, Starr, SC 29684. Owens Corning also owns a plant at 1 Foundation Dr

#2211, Savannah, GA 31408 in Chatham County, which is not currently believed to be contributing to the contamination of Plaintiff's water supply. Owens Corning purchased PFAS and/or PFAS-containing products from PFAS Manufacturers to use in its insulation, roofing, and fiberglass composites business. As a result, Owens Corning is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

92.     Defendant Pactiv LLC ("Pactiv") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in Lake Forest, Illinois. Pactiv is authorized to do business in the State of Georgia. Pactiv owns and operates a packaging plant located at 578 Old Jackson Hwy, Jackson, SC 29831. Pactiv purchased PFAS and/or PFAS-containing products from PFAS Manufacturers to use in its packaging business. As a result, Pactiv is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

93.     Defendant Prayon Inc. ("Prayon") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1610 Marvin Griffin Rd, Augusta, GA, 30906. Prayon is registered to do business in the State of Georgia. Prayon owns and operates a facility located at 1610 Marvin Griffin Rd, Augusta, GA, 30906. Prayon manufactures inorganic chemicals at its facility. The chemical manufacturing facility was formerly owned and operated by Monsanto Company, Solutia Inc., and Astaris LLC. Upon information and belief, Monsanto was a competitor for 3M and DuPont. Monsanto purchased PFAS and/or PFAS containing products for fiber application. As a result, Prayon is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

94.     Defendant QualaWash Holdings, LLC ("QualaWash") is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of

- 25 -

business located in Tampa, Florida. QualaWash is registered to do business in the State of Georgia. QualaWash owns and operates cleaning solutions facilities located at 1415 Columbia Nitrogen Dr, Augusta, GA 30901 (Facility Number 268) and 1615 Doug Barnard Parkway Augusta, GA 30901 (Facility Number 259/559). QualaWash also owns facilities and/or offices at 14 Aviation Court, Savannah, GA 31408 (Facility Number 247/547); 45 Sonny Perdue Drive, Garden City, GA 31405 (Facility Number 254); and 205 Lissner Avenue Savannah, GA 31408 (Facility Number 147) in Chatham County, which are not currently believed to be contributing to the contamination of Plaintiff's water supply. QualaWash is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

95.    Defendant Sage Automotive Interiors, Inc. ("Sage") is a corporation organized and existing under the laws of the State of South Carolina, with its principal place of business located in Greenville, South Carolina. Sage is registered to do business in the State of Georgia. Sage is an automotive interior design company that was spun off from Milliken in 2009. Sage operates manufacturing plants located at 1395 SC-72, Abbeville, SC 29620 (the "Sharon Plant") and 601 Brooks St, Abbeville, SC 29620 (the "Abbeville Plant"). Sage purchased PFAS or PFAS-containing products from PFAS Manufacturers to use in its automotive interior design business. As a result, Sage is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

96.    Defendant Shaw Industries, Inc. is a domestic corporation with its principal place of business located at 616 E Walnut Ave, P.O. Drawer 2128, Dalton, GA, 30721.

97.    Defendant Shaw Industries Group, Inc. is a domestic corporation with its principal place of business located at 616 E Walnut Ave, P.O. Drawer 2128, Dalton, GA, 30721.

- 26 -

98.     Defendants Shaw Industries, Inc. and Shaw Industries Group are hereinafter collectively referred to as "Shaw." Shaw operates a carpet manufacturing facility located at 136 E Frontage Rd, Aiken, SC 29805 ("Plant 78"). Upon information and belief, Shaw formerly owned and/or operated a fiber manufacturing plant ("Plant 8N & 8P") located at 441 Masters Blvd, Anderson, SC 29626, which is now a First Quality manufacturing facility. Shaw also owns facilities and/or offices at 161 Morgan Lakes Industrial Blvd, Pooler, GA 31322 ("Plant PN"); 595 Northport Pkwy, Savannah, GA 31407 ("Plant PK"); 307 International Trade Pkwy, Savannah, GA 31407 ("Plant QQ"); 445 Northport Pkwy, Suite 200, Savannah, GA 31407 ("Plant 5S"); and 590 Northport Pkwy, Port Wentworth, GA 31407 ("Plant QK"); and 590 Northport Pkwy, Port Wentworth, GA 31407 ("Plant QM") in Chatham County, which are not currently believed to be contributing to the contamination of Plaintiff's water supply.

99.     Shaw purchased PFAS and/or PFAS-containing products from PFAS Manufacturers to use in its carpet manufacturing business. As a result, Shaw is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

100.    Defendant Sterling Specialty Chemicals US LLC ("Sterling"), formerly known as "Kemira Chemicals Inc.," is a domestic limited liability company with its principal place of business located in Jersey City, New Jersey. Sterling is registered to do business in the State of Georgia.

101.    Defendant Kemira Water Solutions Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Atlanta, Georgia. Kemira Water Solutions Inc. is registered to do business in the State of Georgia.

102.    Defendants Sterling and Kemira Water Solutions Inc. are hereinafter collectively referred to as "Kemira." Kemira owns and operates a chemical manufacturing plant located at

2360 Doug Barnard Pkwy, Augusta, GA 30906. Kemira purchased PFAS and/or PFAS-containing products from PFAS Manufacturers to use in its chemical manufacturing business. As a result, Kemira is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

103.    Defendant Trantech Radiator Products, Inc. ("Trantech") is a corporation organized and existing under the laws of the State of Delaware. Trantech owns and operates a radiator manufacturing facility located at 1 Tranter Dr, Edgefield, SC 29824. Upon information and belief, Trantech used PFAS in its operations at this facility.  As a result, Trantech is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Chatham County.

104.    The "PFAS Users" include the entities listed in Paragraphs 57 through 103.

105.    The PFAS Users in the past have owned and operated, and/or currently own and/or operate, manufacturing facilities related to the carpet, chemical, metal finishing, packaging, paper and/or textile industries, which in the past have used, and/or currently use, PFAS in their manufacturing processes. These facilities are located upstream of Plaintiff's source water intake on Abercorn Creek.

106.    Industrial wastewater discharged in the past and/or currently from the PFAS Users' manufacturing facilities contains high levels of PFAS, which have invaded the environment and/or surface water source(s) where Plaintiff withdraws its source water and ultimately contaminates Plaintiff's drinking water supply.

107.    The PFAS Users' industrial wastewater has been discharged into the relevant waterways through direct discharges, discharges to a wastewater treatment plant, and/or discharges to a landfill.

- 28 -

108.    Defendants' discharges of PFAS occur upstream of Plaintiff's drinking water intake and, as a direct result, contaminate the Plaintiff's water supply.

109.    In addition to discharging PFAS in industrial wastewater, the PFAS Users have also discharged PFAS by way of releases, leaks, and spills into stormwater drains which feed into local creeks, waterways, streams, rivers and groundwater.

110.    The PFAS Users knew or should have known that PFAS are harmful to human health and the environment, and that their PFAS-contaminated waste streams would invade and persist in the environment, groundwater and Plaintiff's source water supply.

111.    The PFAS Users have known or should have known that the release of PFAS into the environment through wastewater, stormwater and other discharges is prohibited by the PFAS Users' operative permits and/or applicable state and local laws and regulations.

112.    The PFAS Users have caused and contributed, and are still causing and contributing, to a continuous nuisance and trespass through their past and present manufacture, use, purchase, sale, supply, discharge, and/or release of PFAS and products containing or degrading into PFAS.

## FACTUAL ALLEGATIONS

I.    **Defendants Have Known for Decades That "Long-Chain" PFAS are a Threat to Human Health and the Environment.**

113.    PFAS are man-made, synthetic chemicals used to impart oil-, water-, and stain-resistance to various products, including carpet, chemical, metal finishing, packaging, paper and/or textiles. The same chemical properties that provide enhanced soil-resistant attributes also make PFAS resistant to degradation and persistent in the environment.

114.    PFAS are known to the EPA and the Defendants as "forever chemicals" because these man-made chemicals persist in the environment for extremely long periods and do not

- 29 -

degrade like other chemicals. PFAS accumulate in the human body through the process of bioaccumulation. In fish and mammals, PFAS accumulate, build, and increase through biomagnification. PFAS also migrate through surface water and groundwater, allowing PFAS compounds to travel long distances while causing extensive contamination.

115.    Since PFAS do not degrade naturally and are synthetic "forever chemicals," PFAS released into the environment ten (10), twenty (20), and thirty (30) plus years ago will remain present and will continue causing pollution that is a threat to public health, unless removed by very specific filtration methods.

116.    Although there are thousands of chemical substances that fall under the PFAS umbrella, the two most notorious PFAS chemicals are perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").

117.    PFOS and PFOA are considered "long-chain" PFAS (sometimes referred to as "C-8" chemistries), because they contain eight (8) fluorinated carbon atoms. Defendants knew that, because of the strong carbon-fluorine bond, PFOS and PFOA do not degrade naturally in the environment.

118.    According to the EPA, 3M was the sole manufacturer of PFOS in the United States and the principal manufacturer of PFOS worldwide. Upon information and belief, 3M supplied PFOS and/or products containing or degrading into PFOS to the PFAS Users for use in their manufacturing processes.

119.    All of the PFAS Manufacturers manufactured PFOA and/or products containing or degrading into PFOA.

120.    Upon information and belief, the PFAS Manufacturers supplied PFOA and/or products containing or degrading into PFOA to the PFAS Users for use in their manufacturing processes.

121.    Upon information and belief, Archroma, Clariant, Halocarbon and Solvay directly discharged wastewater from its PFAS manufacturing operations, which contained PFOA and/or PFAS, to the Savannah River basin upstream of Plaintiff's surface water intake.

122.    Upon information and belief, DuPont began manufacturing PFAS in the 1930s and/or 1940s.

123.    Upon information and belief, 3M began manufacturing PFOS and PFOA in the 1940s.

124.    Upon information and belief, Daikin, DuPont and Halocarbon began using PFOA in their manufacturing processes in the 1950s. Daikin and Dupont purchased the PFOA from 3M until the 1970s, at which time Daikin and Dupont began manufacturing their own telomer-based PFOA.

125.    Upon information and belief, Solvay began manufacturing PFOA in the 1960s.

126.    Upon information and belief, the predecessor businesses and business units of Clariant and Archroma began manufacturing PFOA in the 1960s or earlier.

127.    3M and DuPont began studying the toxicity of PFOS and PFOA as early as the 1940s and 1950s. Upon information and belief, the other PFAS Manufacturers also studied the toxicity of PFOA and/or PFOS at various times.

128.    By the 1970s, 3M and DuPont were aware that their products persisted indefinitely in the environment. 3M also learned during this time that PFOS was present in the blood of its employees and the general public.

129.    In the 1970s and 1980s, 3M began conducting animal studies to determine the possible carcinogenicity of PFAS chemicals. One such study, an investigation into the effects of PFOS on rhesus monkeys, had to be aborted prior to the conclusion of the study "[b]ecause of unexpected early mortalities in all monkeys at all levels" of PFOS dosage. In 1978, a 3M interoffice correspondence concluded that "[r]ecent animal studies have shown that FC-95 [PFOS] is more toxic than was previously believed."

130.    By the 1980s and 1990s, 3M and DuPont were fully aware that PFOS and PFOA were toxic and persistent in the environment and that conventional treatment methods were ineffective at removing these pollutants. Nevertheless, the two companies actively hid their findings from regulators and the general public. In 1988, a 3M internal memo raised concerns that 3M had "perpetuate[d] the myth that these fluorochemical surfactants are biodegradable."

131.    Upon information and belief, Daikin, Halocarbon and Solvay were becoming increasingly aware of the risks associated with PFOA by the 1980s and were fully aware that PFOA was persistent, bioaccumulative and toxic by the 1990s. Upon information and belief, so were the predecessor businesses or business units of Clariant and Archroma.

132.    In 1997, 3M prepared a Material Safety Data Sheet (MSDS) for a product containing PFAS. The MSDS contained the following warning:

CANCER:
WARNING: Contains a chemical which can cause cancer. (3825-26-1) (1983 and 1993 studies conducted jointly by 3M and DuPont).

133.    This warning was removed from subsequent MSDSs.

134.    In the mid to late 1990s, 3M began a comprehensive, multi-city investigation into the extent of its PFAS pollution and an "exposure assessment" to determine potential exposure pathways of its PFAS. It found an unending cycle of pollution in which PFAS Manufacturers,

- 32 -

PFAS Users, and Landfills all play a role in continuing the invasion of PFAS in surface and groundwater, wastewater, and ultimately, drinking water.

135.   3M also concluded during this investigation that reverse osmosis is the only treatment method capable of removing all PFAS.

136.   In 1999, Richard Purdy, one of 3M's lead scientists on the multi-city study, resigned from his position due to his "profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of perfluorinated sulfonates (PFOS) . . . and its precursors."

137.   Mr. Purdy's letter, which was also sent to a representative of the EPA, further stated that PFOS "is the most insidious pollutant since PCB" and "more stable than many rocks."

138.   Following Mr. Purdy's letter, the EPA began an investigation into PFOS after receiving data that "PFOS was persistent, unexpectedly toxic, and bioaccumulative (PBT)." Federal Register/Vol. 68, 2003.

139.   During its subsequent investigation of 3M, the EPA disclosed that "following negotiations with EPA, 3M . . . announced that it will voluntarily phase out perfluorooctanyl sulfonate ("PFOS") chemistry." The EPA determined that PFOS was toxic and accumulated to a high degree in humans and animals. The EPA's preliminary risk assessment found unacceptable margins of exposure for workers and possibly the general population exposed to PFOS.

140.   The EPA concluded that "PFOS represents an unacceptable technology that should be eliminated to protect human health and the environment from potentially severe long-term consequences." Shortly thereafter, the EPA expanded its investigation to perfluorooctanoic acid (PFOA), stating "EPA was concerned in part because 3M had also found PFOA in human blood during the studies on PFOS."

141.    After 3M announced that it was withdrawing PFOS and PFOA from the market in 2000, DuPont and Daikin continued to manufacture and/or use PFOA with full knowledge that the substances had been withdrawn by 3M due to environmental and potential health risks to the public.

142.    Based on 3M's withdrawal from the market, Daikin made a conscious decision and effort to increase its market share for PFAS sales in the United States.

143.    Upon information and belief, the PFAS Users continued to purchase, use, and discharge PFOS and PFOA, and products containing or degrading into PFOS and PFOA, with full knowledge that the substances had been withdrawn by 3M due to environmental and potential health risks to the public.

144.    Upon information and belief, the PFAS Users continued their use of PFOS and PFOA containing products, even as the PFAS Users' trade organizations/associations were discussing the risks and dangers associated with these chemicals, including the persistent, bioaccumulative and toxic nature of these chemicals.

145.    In some instances, the PFAS Manufacturers and/or trade organizations provided instructions and/or MSDS to the PFAS Users not to allow these PFAS chemicals to be placed into public sewer systems, or surrounding waterways, without pretreatment and proper permitting, but these warnings were ignored.

146.    In some instances, the PFAS Manufacturers had employees/agents in the PFAS Users' facilities directing the application of PFAS by the PFAS Users, and with full knowledge that the PFAS was getting into the PFAS Users' wastewater and into the surrounding waterways.

147.    On December 14, 2005, EPA levied a record-setting $16.5 million civil administrative penalty against DuPont for violations of the Toxic Substances Control Act

- 34 -

("TSCA") and the Resource Conservation and Recovery Act ("RCRA") reporting requirements, surrounding DuPont's decision not to submit information about its environmental releases of PFOA to drinking water in West Virginia and Ohio, as well as its failure to disclose blood serum measurements of PFOA in residents consuming the drinking water.

148.    On April 25, 2006, EPA levied a $1.5 million civil administrative penalty against 3M for 244 violations of TSCA and for failing to disclose information about PFAS and its substantial risks.

149.    By 2006, the majority of an EPA Science Advisory Board expert committee had recommended that PFOA be considered "likely to be carcinogenic to humans." Similarly, an independent C-8 Science Panel identified kidney cancer and testicular cancer as having a "probable link" to PFOA exposure, based on epidemiological and other data in the Mid-Ohio Valley.

150.    Despite the growing awareness that PFOA was just as persistent, bio-accumulative, and toxic as PFOS, Archroma, Clariant, Daikin, DuPont, Halocarbon and Solvay continued to manufacture and supply PFOA and products containing and/or degrading into PFOA until at least 2015.

151.    Clariant claims that it stopped manufacturing PFOA in September of 2012, because it sold all of its business units that produced, manufactured and/or used PFOA. However, upon information and belief, Clariant continued to produce, manufacture and/or use other PFAS until December 2023.

152.    Daikin claims it "completely ceased the manufacture and use of PFOA (perfluorooctanoic acid) and related substances, and manufacture of products which use PFOA and related substances as a raw material, as of the end of calendar year 2015."

153.    DuPont claims it phased out of PFOA by 2015, but also spun off its Specialty Chemicals unit, which made C8/PFOA, into Chemours in July 2015. Chemours continued manufacturing other PFAS and still manufactures PFAS.

154.    Solvay claims it "totally phased-out the use of Perfluorooctanoic Acid (PFOA) in mid-2013," even though Solvay admits it "initiated its efforts for the reduction of PFOA environmental emissions and product content in 2002." Solvay states that its "PFOA was substituted with an alternative molecule with an improved toxicological profile."

155.    All of the Defendants have known that PFOS and PFOA are toxic, persistent, and bioaccumulative.

156.    All of the Defendants have known or should have known that the ordinary usage of products containing or degrading to PFOS and PFOA in manufacturing processes will cause PFOS and PFOA to discharge into the environment via industrial wastewater effluent, stormwater runoff or other discharges.

157.    All of the Defendants have known that permits and/or state and local laws and regulations prevent the discharge of PFOS and PFOA into conventional wastewater treatment plants incapable of removing or treating PFOS and PFOA.

158.    All of the Defendants have known that the PFAS products used by the PFAS Users would ultimately enter the Plaintiff's drinking water supply, and that Plaintiff's conventional drinking water treatment systems are incapable of removing PFOS and PFOA from water supplies.

159.    Nevertheless, the Defendants in this case supplied, used, purchased, and/or accepted PFOS and PFOA, and/or products containing or degrading into PFOS and PFOA, without using adequate care to prevent the contamination of Plaintiff's source water supply.

160.    PFOS and PFOA manufactured, used, and discharged by the Defendants are still present at dangerously high levels in Plaintiff's source water supply. Some of these Defendants are still discharging wastewater, leachate, stormwater and/or other types of discharges containing PFOS and PFOA into the Plaintiff's source water supply.

II.    "Short-Chain" PFAS

161.    After 3M phased out "long-chain" PFAS, it began selling "short-chain" PFAS compounds (sometimes referred to as "C-6" and "C-4" chemistries), and/or products that contained or degraded into "short-chain" PFAS, to the PFAS Users. Archroma, Clariant, Daikin, DuPont (and later Chemours), Halocarbon and Solvay eventually converted to "short-chain" PFAS as well.

162.    In or around 2015, DuPont spun off its Performance Chemicals business line into a new company, Chemours, which continued selling and marketing "short-chain" PFAS, including but not limited to HFPO-DA (or "Gen-X").

163.    In December 2022, over twenty years after announcing that it would discontinue production of PFOS and PFOA, 3M "announced it will exit per- and polyfluoroalkyl substance (PFAS) manufacturing and work to discontinue the use of PFAS across its product portfolio by the end of 2025."

164.    The "short-chain" PFAS compounds sold and/or used by the PFAS Manufacturers included and/or degraded into PFBS, PFBA, PFHxA, PFHxS, PFNA, PFPeA, Gen-X, and more.

165.    All of the Defendants knew or should have known that that these "short-chain" PFAS compounds were just as toxic, persistent, and bioaccumulative as their "long-chain" predecessors.

166.    In many instances, the PFAS Users continued their use of "short chain" PFAS and PFAS-containing products, even as the PFAS Users' trade organizations/associations were

discussing the risks and dangers associated with these chemicals, including the persistent, bioaccumulative and toxic nature of these chemicals.

167. All of the Defendants knew or should have known that the ordinary usage of products containing or degrading to PFAS in manufacturing processes will cause PFAS to discharge into the environment via industrial wastewater effluent, stormwater runoff or other discharges.

168. All of the Defendants knew or should have known that permits and/or state and local laws and regulations prevent the discharge of PFAS into conventional wastewater treatment plants incapable of removing or treating PFAS.

169. All of the Defendants knew or should have known that the "short chain" PFAS products used and discharged by the PFAS Users would ultimately enter the Plaintiff's source water supply.

170. All of the Defendants knew or should have known that Plaintiff's conventional drinking water treatment systems are currently incapable of removing "short chain" PFAS from its source water supply.

171. Nevertheless, the Defendants in this case supplied, used, purchased, and/or accepted "short chain" PFAS, and/or products containing or degrading into PFAS, without using adequate care to prevent the contamination of Plaintiff's source water supply.

172. PFAS manufactured, used, and discharged by the Defendants are still present at dangerously high levels in Plaintiff's drinking water systems.

173. Upon information and belief, Defendants continue to supply, use, purchase, accept, and/or discharge "short-chain" PFAS, and/or products containing or degrading into "short-chain" PFAS, without using adequate care to prevent the contamination of Plaintiff's source water supply.

III.    PFAS Regulations

174.    In 2009, the U.S. Environmental Protection Agency ("EPA") issued a Provisional Health Advisory for drinking water setting advisory levels of 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS in drinking water.

175.    In May of 2016, EPA published a Lifetime Health Advisory for drinking water setting the levels at 70 ppt *combined* for PFOA and PFOS. This Health Advisory was based on "studies of the effects of PFOA and PFOS on laboratory animals" and "epidemiological studies to human populations" which "indicate that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."

176.    In 2022, EPA updated the 2016 Health Advisory for PFOS and PFOA in drinking water, dramatically lowering the recommended limits to .02 ppt for PFOS and .004 ppt for PFOA. The EPA also set levels for two "short-chain" PFAS: PFBS and Gen-X.

177.    In March 2023, EPA proposed a National Primary Drinking Water Regulation ("NPDWR") to establish legally enforceable Maximum Contaminant Levels ("MCLs") for six PFAS in drinking water: PFOA, PFOS, PFBS, PFNA, PFHxS, and Gen-X.

178.    On April 10, 2024, EPA announced the final, enforceable NPDWR for these six PFAS.

179.    Under the NPDWR, public water systems, like Plaintiff's water system, will be required to monitor and report concentrations of PFAS in their drinking water. The NPDWR will

also require public water systems to provide drinking water with no more than 4 ppt PFOS, 4 ppt PFOA, 10 ppt PFHxS, 10 ppt PFNA, or 10 ppt Gen-X.

180.    Moreover, the NPDWR will require that public water systems, like Plaintiff's water system, remove PFBS, PFNA, PFHxS, and Gen-X from their drinking water pursuant to a Hazard Index. Under this Hazard Index, *combined* concentrations of these compounds can constitute a violation even where each *individual* compound is lower than the MCL. By way of example, drinking water with 9 ppt Gen-X, 100 ppt PFBS, 4 ppt PFNA, and 3 ppt PFHxS would constitute a violation of the Hazard Index even though each individual concentration is below the MCL.

181.    In announcing these MCLs, EPA stated that it "expects that over many years the final rule will prevent PFAS exposure in drinking water for approximately 100 million people, prevent thousands of deaths, and reduce tens of thousands of serious PFAS-attributable illnesses." Pursuant to the NPDWR, EPA also established "health-based" Maximum Contaminant Level Goals ("MCLGs") for PFOA and PFOS at <u>zero</u> ppt.

182.    The EPA explained the decision-making process behind the MCLGs: "Following a systematic review of available human epidemiological and animal toxicity studies, EPA has determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe."

183.    On April 19, 2024, the EPA formally designated PFOA and PFOS as "Hazardous Substances" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERLCA"). According to the EPA, the designation of PFOA and PFOS as "Hazardous Substances" under CERCLA "is designed to ensure that those responsible for contamination pay to clean it up."

IV.    Fate and Transport

- 40 -

184.    All of the Defendants have caused or contributed to the PFAS in the Savannah River basin, Abercorn Creek and Plaintiff's source water supply.

185.    Upon information and belief, the following Defendants manufactured, formulated, sold, supplied and/or transported PFAS and/or PFAS-containing products to PFAS Users that were ultimately discharged, directly or indirectly, into Plaintiff's water supply: 3M, Archroma, Chemours, Clariant, Daikin, DuPont, Halocarbon, INV, and Solvay.

186.    Upon information and belief, the following Defendants directly discharged, whether through an NPDES permit or otherwise, PFAS and/or wastewater containing PFAS into the Savannah River basin, Abercorn Creek, and Plaintiff's source water supply: Archroma, Clariant, Clearwater Paper, Cytec, First Quality, Graphic Packaging, International Paper, Kimberly-Clark, Milliken, Mohawk, MVM, Owens Corning, Prayon, Sage, and Shaw.

187.    Upon information and belief, the following Defendants discharged PFAS and/or wastewater containing PFAS to the HCWWTP, which passed through the HCWWTP and into the Savannah River basin, Abercorn Creek, and Plaintiff's source water supply: Archroma,[2] Halocarbon, Allnex, Cytec, GSF, Owens Corning, Pactiv, Shaw, and Trantech.

188.    Upon information and belief, the following Defendants discharged PFAS and/or wastewater containing PFAS to the Augusta WWTP, which passed through the Augusta WWTP and into the Savannah River basin, Abercorn Creek, and Plaintiff's water supply: Solvay, Augusta Liquidations, Envalior, Covestro, Industrial Metal, ICT, Prayon, QualaWash, and Kemira.

189.    Upon information and belief, the following Defendants discharged PFAS and/or wastewater containing PFAS to the City of Anderson's Generostee Creek WWTP, which passed

---

[2] Through leachate from the Three Rivers Regional Municipal Solid Waste Landfill.

through the Generostee Creek WWTP and into the Savannah River basin, Abercorn Creek, and Plaintiff's water supply: First Quality, JPS, and Owens Corning.

190.    The HCWWTP discharges into Horse Creek, which ultimately flows to the Savannah River, Abercorn Creek and Plaintiff's source water supply.

191.    The Augusta WWTP discharges into Butler Creek, which ultimately flows to the Savannah River, Abercorn Creek and Plaintiff's source water supply.

192.    The Generostee Creek WWTP discharges into Big Generostee Creek, which ultimately flows to the Savannah River, Abercorn Creek and Plaintiff's source water supply.

193.    None of the Defendants' permits, whether it be an NPDES permit, Industrial User permit, or otherwise, authorizes the Defendants to discharge PFAS into the surrounding waterways and/or environment.

## V.    PFAS POLLUTION IN AND AROUND ABERCORN CREEK

194.    Plaintiff draws its source water from Abercorn Creek. The lower Savannah River is a deltaic system that branches into a series of interconnected distributary channels. Abercorn Creek is one of these distributary channels with water flowing between it and the Savannah River in both directions depending on tides, surface water runoff and other factors.

195.    PFAS pollution caused by the Defendants has jeopardized the safety of the Savannah River and Abercorn Creek, as an ongoing source of drinking water for the residents of Chatham County and surrounding areas.

196.    Upstream from Savannah's drinking water intake, the PFAS Users operate manufacturing and other facilities that in the past and/or currently discharge PFAS into the Savannah River, and/or its related tributaries and watersheds, directly and/or via PFAS-contaminated industrial wastewater discharges to wastewater treatment plants or landfills

- 42 -

incapable of removing PFAS. These PFAS were in the past, and in some cases still today, manufactured and sold by the PFAS Manufacturers.

197.  Defendants have known or should have known that PFAS cannot be removed by conventional wastewater treatment methods and that the Defendants' PFAS-contaminated wastewater passes directly through the wastewater treatment systems and back into the Savannah River upstream of Savannah.

198.  In addition to discharging PFAS into the Savannah River, and/or its related tributaries and watersheds, via direct discharge or industrial wastewater discharges to local wastewater treatment plants or landfills, Defendants have also discharged PFAS into the Savannah River, and/or its related tributaries and watersheds, by way of stormwater and groundwater discharges.

199.  As a result of Defendants' manufacture, use, disposal, and discharge of PFAS and/or products and waste that contain or degrade into PFAS, dangerously high levels of PFAS have been detected in the Savannah River and related tributaries and watersheds. The levels of PFAS detected far exceed EPA's most recent Health Advisory and Maximum Contaminant Level Goals and exceed the Maximum Contaminant Levels.

200.  Plaintiff has conducted and/or reviewed numerous PFAS samples throughout the Savannah River basin and has found dangerously high levels of PFAS throughout the watershed, often times directly below certain Defendants' manufacturing facilities.

201.  Plaintiff has also sampled the source water at its Abercorn Creek intake and finished drinking water at its I&D facility on numerous occasions, finding levels of PFOA and PFOS above the EPA's MCL.

202.    Because of their persistence and bioaccumulation, PFAS discharged into the Savannah River basin five (5), ten (10), or even twenty (20) years ago are still present in Plaintiff's source water supply and still impacting Plaintiff's ability to provide safe drinking water to its customers. These "forever chemicals" will continue to pollute Plaintiff's source water supply for generations to come—unless and until they are removed through very specific treatment methods.

203.    Scientific experts, including several of the Defendants' own scientists and consultants, agree that PFOS and PFOA do not readily degrade and will remain in the environment for centuries.

204.    Because Plaintiff's water treatment plant, like most water treatment plants in the country, is currently incapable of removing PFAS, Plaintiff's source and finished water both contain levels of "forever chemicals" higher than that which is allowed by EPA under the 2022 Health Advisory and the 2024 National Primary Drinking Water Regulation.

## COUNT I – NEGLIGENCE

205.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth and restated herein.

206.    As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, users, disposers, and/or handlers of PFAS, products containing and/or degrading into PFAS, products manufactured using PFAS, and/or waste containing and/or degrading into PFAS, Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' PFAS might foreseeably harm, in their handling, control, use, and disposal of PFAS.

207.    The Georgia Water Quality Control Act ("GWQCA") regulations specify that all waters of the State of Georgia shall be free from: "industrial waste or other discharges in amounts sufficient to be unsightly or to interfere with legitimate water uses" Ga. Comp. R. & Regs. § 391-

3-6-.03(5)(b); "industrial or other discharges which produce turbidity, color, odor or other objectionable conditions which interfere with legitimate water uses" Ga. Comp. R. & Regs. § 391-3-6-.03(5)(c); "toxic, corrosive, acidic and caustic substances discharged from . . . industries or other sources, such as nonpoint sources, in amounts, concentrations or combinations which are harmful to humans, animals or aquatic life" Ga. Comp. R. & Regs. § 391-3-6-.03(5)(e).

208.    Pursuant to O.C.G.A. § 12-5-51, Defendants owed a duty Plaintiff, as well as to all persons whom Defendants' PFAS might foreseeably harm, to avoid intentionally or negligently causing or permitting any sewage, industrial wastes, other wastes, or other substance or substances to be discharged or deposited in the waters of the State of Georgia.

209.    Defendants owed a duty to Plaintiff, as well as to all person whom Defendants' PFAS might foreseeably harm, to exercise reasonable care in their manufacturing and marketing procedures and waste-handling and disposal operations to prevent the discharge of toxic PFAS chemicals into the Plaintiff's source water supply, water treatment plant, and related property.

210.    As described in detail above, Defendants breached their duty to exercise due care and reasonable care owed to the Plaintiff. The Defendants knew or should have known that their PFAS is persistent in the environment and bioaccumulative and toxic to humans and wildlife. The Defendants also knew or should have known that conventional water filtration systems are incapable of removing PFAS from environmental media, and that the Plaintiff's current filtrations systems would be incapable of removing Defendants' PFAS from its source water supply. The Defendants' breaches of their duties to Plaintiff constitute negligent, willful, and/or reckless conduct.

211.    Plaintiff has a reasonable expectation that Defendants avoid contaminating Plaintiff's source water supply, Plaintiff's property, and the surrounding environment—an expectation that extends to the pollution of the area's source water supply.

212.    As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, and omissions, the Plaintiff has been damaged and has incurred expenses and will continue to incur expenses in the future, which will likely amount to hundreds of millions of dollars.

213.    As such, Plaintiff is entitled to recover damages against all Defendants, jointly and severally, in an amount to be determined by the enlightened conscience of an impartial jury, including past and future damages, plus interest, and all recoverable costs.

## COUNT II – PUBLIC NUISANCE

214.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth and restated herein.

215.    Defendants have created a public nuisance by failing to prevent the contamination of Abercorn Creek and the Savannah River and, as a direct result, Plaintiff's source water supply, water treatment plant, and related property with Defendants' PFAS, thereby causing Plaintiff hurt, inconvenience, and harm. The nuisance created by Defendants' PFAS is continuous and ongoing.

216.    The contamination of Abercorn Creek, the Savannah River and the Plaintiff's water supply, water treatment plant, and related property constitutes a public nuisance, which has caused Plaintiff damages that are separate and distinct from those faced by the general public, including but not limited to: past and future expenses associated with installing, maintaining, and operating drinking water treatment systems and associated facilities and equipment capable of removing PFAS; past and future expenses associated with testing and monitoring raw and finished water for the presence of PFAS; costs associated with remediating Plaintiff's existing treatment facilities as

- 46 -

necessary to remove PFAS from Plaintiff's water supply; damage to goodwill and reputation; and lost revenue and sales.

217.    In addition to the special damages suffered by the Plaintiff, the Defendants' PFAS contamination has created a condition that threatens the health, safety and well-being of residents of Chatham County and the surrounding areas, including Plaintiff's customers.

218.    It was reasonably foreseeable, and in fact known to Defendants, that their actions would contaminate, and have contaminated, Plaintiff's source water supply to a degree incapable of remediation through conventional treatment methods. This nuisance has caused substantial damage and will continue to cause damages until Plaintiff receives compensatory damages for the necessary improvements of treatment technology that will allow for the removal of PFAS from Plaintiff's source water supply and ultimately its drinking water system.

219.    Defendants knew that their acts and omissions would cause Plaintiff's source water supply to become contaminated by PFAS. Defendants have acted with a conscious indifference to the dangerous consequences of their actions and the reasonably foreseeable impact such actions would have on public health, safety and welfare.

220.    Accordingly, Plaintiff is entitled to special damages and abatement of this public nuisance by all Defendants, including but not limited to (i) preventing any and all future contamination of Plaintiff's source water supply by PFAS and (ii) the eradication of all current PFAS contamination currently in and around the Savannah River in the vicinity of Plaintiff's source water intake facility, pursuant to O.C.G.A. §§ 41-2-1, *et seq.*

## COUNT III – PRIVATE NUISANCE

221.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth and restated herein.

- 47 -

222.   Plaintiff owns and occupies property used to serve its water customers, including a source water intake site, water distribution system, water treatment plant, offices, and associated facilities and equipment.

223.   Plaintiff owns land and water rights which permits it to withdraw source water from Abercorn Creek to produce drinking water for its customers.

224.   Defendants have created and contributed to a nuisance by causing or contributing to cause toxic PFAS chemicals to contaminate Plaintiff's source water supply, thereby causing Plaintiff hurt, inconvenience, and harm. Each Defendant has caused, contributed to, and/or maintained such nuisance, and is a substantial contributor to such nuisance.

225.   The contamination of the source water at Plaintiff's intake site, water treatment plant, and related property constitutes a private nuisance depriving Plaintiff of its ability to deliver clean, safe and uncontaminated drinking water to its customers. The nuisance created by Defendants' PFAS is continuous and ongoing.

226.   It was reasonably foreseeable, and in fact known to Defendants, that their actions would contaminate, and have contaminated, the source water supply at Plaintiff's intake site. The contamination caused, contributed to, and/or maintained by Defendants substantially and unreasonably interferes with Plaintiff's property rights to appropriate, use, and enjoy source water from Abercorn Creek.

227.   Defendants' nuisance has caused substantial damages and will continue to cause damages until Plaintiff receives compensatory damages for the necessary improvements of treatment technology that will allow for the removal of PFAS from Plaintiff's source water supply.

228.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination.

229.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage to Plaintiff's property, including PFAS contamination of Plaintiff's source water supply. Defendants committed each of the above-described acts and omissions willfully and with malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences in order to promote sales of their products and/or services. Plaintiff therefore demands an award of punitive damages because of the aggravating circumstances alleged herein in order to penalize, punish, and deter Defendants' conduct.

230.    As such, Plaintiff is entitled to recover damages against all Defendants, jointly and severally, in an amount to be determined by the enlightened conscience of an impartial jury, including past and future damages, plus interest, and all recoverable costs.

## COUNT IV – ABATEMENT OF NUISANCE

231.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth and restated herein.

232.    Pursuant to O.C.G.A. §§ 41-2-1 and 41-2-2, Plaintiff has the right to bring an action to abate the nuisance caused by Defendants' manufacture, use, purchase, sale, supply, discharge, and/or release of PFAS, which has caused and continues to cause contamination of Plaintiff's source water supply.

233.    In addition to its claims for damages, Plaintiff is entitled to an injunction to abate the nuisance created and maintained by Defendants based on the continuing and irreparable injury

to the Plaintiff posed by the continuing nuisance and damage to Plaintiff's property interests, for which there is no adequate remedy at law. The Court should issue an injunction pursuant to O.C.G.A. §§ 41-2-1 and 41-2-2 requiring Defendants to take measures necessary to prevent the further contamination of Plaintiff's source water supply, including but not limited to measures to reduce and remove PFAS from Defendants' wastewater discharges, groundwater discharges, stormwater discharges, leachate discharges, and sludge disposals, as well as to fund the measures necessary to prevent these chemicals and toxins from continuing to contaminate Plaintiff's source water supply.

234.    Plaintiff is entitled to an injunction under Georgia's public nuisance statute, O.C.G.A. § 41-2-1, *et seq.,* requiring the abatement of this nuisance by all Defendants, including but not limited to preventing any and all future contamination of Plaintiff's source water by PFAS and the eradication of all current PFAS contamination currently in and around the Savannah River in the vicinity of Plaintiff's source water intake facility

## COUNT V – TRESPASS

235.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth and restated herein.

236.    Plaintiff owns and occupies property used to serve its water customers, including a water intake site, water distribution system, water treatment plant, offices, and associated facilities and equipment.

237.    Plaintiff owns land and water rights which permit it to withdraw source water from Abercorn Creek to produce drinking water for its customers. Plaintiff has a possessory interest in the source water it withdraws from Abercorn Creek in order to treat and sell to its customers as finished drinking water.

238.    Defendants' intentional acts in manufacturing, supplying, using, and/or discharging PFAS and/or products and waste containing or degrading into PFAS, with full knowledge that these toxins would contaminate Plaintiff's source water supply, caused an invasion of Plaintiff's possessory interest in its property by Defendants' chemicals, which has affected and is affecting Plaintiff's interest in the exclusive possession of its property.

239.    Under O.C.G.A. § 51-9-7, the owner of land through which non-navigable watercourses flow is entitled to have such water in its natural and usual flow, free from pollution. "The polluting thereof so as to lessen its value to the owner of such land shall constitute a trespass upon the property."

240.    As landowner of property through which non-navigable watercourses flow, Plaintiff is entitled to source water that is clean, safe, and free of Defendants' pollution and toxic contamination.

241.    Plaintiff has at no time consented to the contamination of its source water supply or the invasion of its property and possessory interests by Defendants' PFAS.

242.    Defendants knew or should have known that their manufacture, use, purchase, sale, supply, disposal, discharge, and/or release of PFAS and PFAS-containing products or waste could contaminate Plaintiff's source water supply and result in an invasion of Plaintiff's possessory interest in its property.

243.    Defendants' trespass is continuous and ongoing. The contamination resulting from Defendants' trespass has migrated and spread and will continue to migrate and spread. Defendants' continuing trespass has impaired Plaintiff's use of its property and has caused Plaintiff's substantial damages.

244.    As such, Plaintiff is entitled to recover damages against all Defendants, jointly and severally, in an amount to be determined by the enlightened conscience of an impartial jury, including past and future damages, plus interest, and all recoverable costs.

## COUNT VI – GEORGIA WATER QUALITY CONTROL ACT

245.    Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

246.    Under O.C.G.A. § 12-5-51, "any person who intentionally or negligently causes or permits any sewage, industrial wastes, or other wastes, oil, scum, floating debris, or other substance or substances to be spilled, discharged, or deposited in the waters of the state, resulting in a condition of pollution as defined by this article, shall be liable in damages to the state and any political subdivision thereof for any and all costs, expenses, and injuries occasioned by such spills, discharges, or deposits."

247.    Each Defendant is a "person" within the meaning of O.C.G.A. § 12-5-51.

248.    Defendants intentionally or negligently caused or permitted PFAS to be deposited into the Savannah River basin and Abercorn Creek, resulting in a condition of pollution as defined by Georgia Code Title 12, Chapter 5, Article 2.

249.    PFAS are industrial wastes within the meaning of O.C.G.A. § 12-5-51.

250.    The amount of the damages assessed pursuant to O.C.G.A. § 12-5-51 "shall include, but shall not be limited to, any costs and expenses reasonably incurred by the state or any political subdivision thereof, as the case may be, in cleaning up and abating such spills, discharges, or deposits, and any costs and expenses reasonably incurred in replacing aquatic life destroyed by such spills, discharges, or deposits. . . . Damages to a political subdivision shall be recoverable in a civil action instituted by such subdivision."

- 52 -

251.    The City of Savannah is a political subdivision of the State of Georgia under the GWQCA.

252.    As a direct and proximate result of Defendants' conduct, Plaintiff has incurred, and will continue to incur, damages including, but not limited to, the costs and expenses set forth in O.C.G.A. § 12-5-51.

## COUNT VII – FAILURE TO WARN (PFAS MANUFACTURERS)

253.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth and restated herein.

254.    The PFAS Manufacturer Defendants had a duty to warn and a continuing duty to warn the PFAS Users and the public of dangers associated with the design, manufacture, disposal, use, and operation of PFAS.

255.    The PFAS Manufacturer Defendants are aware, and have been aware for decades, or should have been aware, of the dangers and hazards associated with the design, manufacture, disposal, use, and operation of PFAS.

256.    The PFAS Manufacturer Defendants failed to warn the public and/or the PFAS Users of the problems, risks, hazards and/or dangers associated with PFAS.

257.    The PFAS Manufacturer Defendants continue to fail to warn or adequately warn the public and/or PFAS Users of the problems, risks, hazards and/or dangers associated with PFAS.

258.    As a direct and proximate result of the PFAS Manufacturer Defendants' failures to warn of these dangerous and hazardous conditions, Plaintiff has suffered significant damages, including but not limited to past, present, and future costs associated with remediating and removing PFAS from its source water supply.

- 53 -

## COUNT VIII – PUNITIVE DAMAGES

259.   Plaintiff incorporates all prior paragraphs by reference as if fully set forth and restated herein.

260.   As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, users, disposers, and/or handlers of PFAS products containing and/or degrading into PFAS, products manufactured using PFAS, and/or waste containing and/or degrading into PFAS, Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' PFAS might foreseeably harm, in their manufacture, marketing, handling, control, use, and disposal of PFAS.

261.   Defendants owed a duty to Plaintiff, as well as to all person whom Defendants' PFAS might foreseeably harm, to exercise reasonable care in their manufacturing procedures and waste-handling and disposal operations to prevent the discharge of toxic PFAS chemicals into the Plaintiff's source water supply, water treatment plant, and related property.

262.   In breaching the duties described above, Defendants' actions demonstrated willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care which would raise the presumption of conscious indifference to consequences.

263.   Defendants knew or should have known that exposure to PFAS and water contaminated by PFAS is hazardous to the environment and to human health.

264.   Defendants knew or should have known the danger to Plaintiff created by Defendants' conduct, practices, actions, and inactions.

265.   Defendants knew or should have known of the likely impact, harm, damage, and injury their conduct would have on the Plaintiff.

266.   Defendants' conduct, practices, and inactions evidence Defendants' reckless disregard for Plaintiff's property.

267.   Plaintiff is entitled to punitive damages against all Defendants, jointly and severally, in an amount to be determined by the enlightened conscience of an impartial jury in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT IX – ATTORNEYS' FEES AND EXPENSES OF LITIGATION

268.   Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

269.   Defendants have acted in bad faith, have been stubbornly litigious, and have caused Plaintiff unnecessary trouble and expense such that Plaintiff is entitled to recover its attorneys' fees and other expenses of litigation pursuant to O.C.G.A. § 13-6-11.

## RELIEF DEMANDED

Wherefore, Plaintiff respectfully requests this Court grant the following relief:

a)   That summons and process issue and that each Defendant be served with a copy of this Complaint as required by law and that each Defendant be required to appear and answer;

b)   That Plaintiff be awarded damages in an amount to be determined by a jury sufficient to compensate Plaintiff for past and future damage, out-of-pocket expenses, and lost profits and sales;

c)   Issue an order requiring Defendants to abate their nuisance and/or otherwise remove their chemicals from Plaintiff's source water supply and to prevent these chemicals from continuing to contaminate Plaintiff's source water supply pursuant to O.C.G.A. §§ 41-2-1, *et seq.*;

d)   Award punitive damages;

e)   Award attorney fees and costs and expenses incurred in connection with the litigation of this matter; and

f)    Award such other and further relief as this Court may deem just, proper, and equitable.

## JURY DEMAND

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

Respectfully submitted this 5th day of February, 2025.

OFFICE OF THE CITY ATTORNEY

2 East Bay Street
City Hall, 3rd Floor GA
Savannah, GA 31401
Phone: 912-525-3131
blovett@savannahga.gov

/s/ R. Bates Lovett
R. BATES LOVETT
Georgia Bar No. 459568
Counsel for Plaintiff

HARRIS LOWRY MANTON LLP

410 East Broughton Street
Savannah, Georgia 31401
Telephone: (912) 651-9967
Facsimile: (912) 651-1276
jeff@hlmlawfirm.com
steve@hlmlawfirm.com
jed@hlmlawfirm.com
molly@hlmlawfirm.com
cdonahue@hlmlawfirm.com

/s/ Jeffrey R. Harris
JEFFREY R. HARRIS
Georgia Bar No. 330315
STEPHEN G. LOWRY
Georgia Bar No. 460289
JED D. MANTON
Georgia Bar No. 868587
MADELINE E. MCNEELEY
Georgia Bar No. 460652
COLE F. DONAHUE
Georgia Bar No. 632966
Counsel for Plaintiff

FRANKLIN LAW LLC

2919 River Dr.
Thunderbolt, GA 31404
Phone: 912-335-3305
rebecca@franklinlawllc.com

/s/ Rebecca Franklin Harris
REBECCA FRANKLIN HARRIS
Georgia Bar No. 141350
Counsel for Plaintiff

- 56 -

FRIEDMAN, DAZZIO & ZULANAS, P.C.

3800 Corporate Woods Drive
Birmingham, AL 35242
Phone: 205-278-7000
jfriedman@friedman-lawyers.com
mconn@friedman-lawyers.com
mgitschier@friedman-lawyers.com
ewright@friedman-lawyers.com

/s/ Matt Conn
JEFF FRIEDMAN
MATT CONN
MADISON GITSCHIER
ETHAN WRIGHT
**Counsel for Plaintiff**
*(Pro Hac Vice Forthcoming)*

e-Filed in Office
Tammie Mosley
Clerk of Superior Cou
Chatham County
Date: 2/5/2025 4:00 !
Reviewer: KW

IN THE SUPERIOR COURT OF CHATHAM COUNTY
STATE OF GEORGIA

THE MAYOR AND ALDERMEN OF THE
CITY OF SAVANNAH, GEORGIA,

    Plaintiff,

v.

3M COMPANY; ALADDIN
MANUFACTURING CORPORATION;
ALLNEX USA, INC.; ARCHROMA U.S., INC;
AUGUSTA LIQUIDATIONS LLC;
CLARIANT CORPORATION; CLEARWATER
PAPER CORPORATION; CORTEVA, INC.;
COVESTRO LLC; COVESTRO COATING
RESINS, INC.; CYTEC INDUSTRIES INC.;
DAIKIN AMERICA, INC.; DUPONT DE
NEMOURS, INC.; E.I. DU PONT DE
NEMOURS AND COMPANY; EIDP, INC.;
ENVALIOR ENGINEERING MATERIALS,
INC.; FIRST QUALITY TISSUE SE, LLC.;
GRANITEVILLE SPECIALTY FABRICS,
LLC; GRAPHIC PACKAGING HOLDING
COMPANY; GRAPHIC PACKAGING
INTERNATIONAL, LLC; HALOCARBON
LIFE SCIENCES, LLC; HALOCARBON, LLC;
HPC HOLDINGS, INC.; ICT INDUSTRIES,
INC.; INDUSTRIAL METAL FINISHING,
INC.; INNOVATIVE CHEMICAL
TECHNOLOGIES, INC.; INTERNATIONAL
PAPER COMPANY; INV PERFORMANCE
SURFACES, LLC; JPS COMPOSITE
MATERIALS CORP.; KEMIRA WATER
SOLUTIONS INC.; KIMBERLY-CLARK
CORPORATION; MILLIKEN & COMPANY;
MOHAWK CARPET, LLC; MOHAWK
INDUSTRIES, INC.; MOUNT VERNON
MILLS, INC.; OWENS CORNING; OWENS
CORNING COMPOSITE MATERIALS, LLC;
OWENS CORNING ROOFING AND
ASPHALT, LLC; OWENS CORNING SALES,
LLC; PACTIV LLC; PRAYON INC.;
QUALAWASH HOLDINGS, LLC; SAGE
AUTOMOTIVE INTERIORS, INC.; SHAW

No.: SPCV25-00167-MI

TRIAL BY JURY REQUESTED

INDUSTRIES GROUP, INC.; SHAW )
INDUSTRIES, INC.; SOLVAY SPECIALTY )
POLYMERS USA, LLC; STERLING )
SPECIALTY CHEMICALS US LLC; THE )
CHEMOURS COMPANY; THE CHEMOURS )
COMPANY FC, LLC; TRANTECH )
RADIATOR PRODUCTS, INC.; and )
FICTITIOUS DEFENDANTS A–J, those )
persons, corporations, partnerships or entities )
who acted either as principal or agent, for or in )
concert with the other named Defendants and/or )
whose acts caused or contributed to the damages )
sustained by the Plaintiff, whose identities are )
unknown to the Plaintiff, but which will be )
substituted by amendment when ascertained, )
)
    Defendants. )

## VERIFICATION

STATE OF GEORGIA

COUNTY OF CHATHAM

COMES NOW the petitioner, who, being duly sworn, deposes and states as follows:

1.  My name is Ronald A. Feldner. I am over the age of eighteen (18) years, am not suffering under any legal disability, and am otherwise competent to make this verification. I am the Chief of Water Resources for the City of Savannah.

2.  I make this verification based on my own personal knowledge and on behalf of the Plaintiff in this case.

3.  I have reviewed the Complaint, which includes a request for injunctive relief, in the above-styled action. As to some matters stated therein, I know the same to be true and correct. As to other matters, I am informed and believe, and on that basis stated, that they are true and correct.

RONALD A. FELDNER, on behalf of The
Mayor and Aldermen of the City of Savannah

Sworn to and subscribed before me

this 5th day of February 2025.

Notary Public

My commission expires Sept. 11, 2026

## RULE 3.2 CERTIFICATION AND STANDING ORDER NOTICE

Pursuant to rules 3.2 and 3.4 of the Uniform Superior Court Rules, I hereby certify that:

(CHECK ONE)

[ X ] no case has heretofore been filed in the Superior Court of the Eastern Judicial Circuit involving substantially the same parties or substantially the same subject matter or substantially the same factual issues which would require the petition-pleading to be specifically assigned to the judge whom the original action was or is assigned.

OR

[ ] this petition-pleading involves substantially the same parties or substantially the same subject matter or substantially the same factual issues as in case # _____.

The Mayor and Aldermen of ___ (Plaintiff) vs. 3M Company, et al. _____ (Defendant) the City of Savannah, Georgia

This __5th__ day of __February__ . 20_25_ .

_____ /s/Jeffrey R. Harris _____ Attorney/Plaintiff

---

## Notice of Eastern Judicial Circuit Standing Orders

**YOU MUST SERVE THIS NOTICE UPON THE OPPOSING PARTY** together with the initial filing of suit, counterclaim, crossclaim or interpleader. The Superior Court has adopted the following STANDING ORDERS which may apply to you and which may affect your ability to obtain a hearing:

1. **MANDATORY MEDIATION ORDER**, effective January 3, 2011: This order requires parties to mediate their case prior to the pretrial conference or trial. Certain limited cases are exempt from the mediation requirement. Please secure a copy of the mediation order and determine if it applies to your case.

2. **ORDER ON PRODUCTION OF DOCUMENTS**, effective March 15, 2002 and reinstated January 3, 2011: This order applies to all domestic cases in which temporary or permanent financial relief is sought. The order requires the parties in such cases to exchange certain documents listed in the order within a specified time frame. A copy of the production of documents order must be served upon the defendant together with the complaint and summons.

3. **TRANSITIONAL PARENTING SEMINAR ORDER**, effective March 10.2010 and reinstated January 3, 2011: This order requires the parties in certain domestic cases involving the interest of children under 18 years of age to complete the "Transitional Parenting Seminar". Please secure a copy of the mediation order and determine if it applies to your case.

COPIES OF THE STANDING ORDERS ARE AVAILABLE AT THE OFFICE OF THE CLERK OF SUPERIOR COURT OR AT:

http://www.chathamcounty.org/department_freeform_T7_R132.html

FORM 3.2 REVISED JAN 2011